Alright, welcome to the Ninth Circuit. Thank you for hearing this case remotely by video. We rescheduled it obviously after the Supreme Court decision came down in Bissonnette. And we're now ready to proceed with the case set for argument today, Nair v. Medline Industries, case number 23-15582. Just remember we've got 15 minutes. Per side and let us know if you want to reserve time for rebuttal. And we've got a little bit of time today because you're the only case set for argument. So we'll go ahead and hear first from Mr. Grood. Stephen Grood v. Medline Industries, LP It is your honor. Thank you. May it please the court, Stephen Grood for the Medline Appellants. And I would like to reserve three minutes for rebuttal, please. The lower court committed reversible error here by finding that plaintiff belonged to a class of workers who played a direct and necessary role in interstate commerce in the face of the evidence that failed to demonstrate that plaintiff loaded trucks that were frequently bound for interstate commerce, or that the class of workers, the warehouse operators, frequently performed duties beyond production-related duties so that they could be viewed as playing a direct and necessary role in interstate commerce. And this case is distinguishable from Saxon because, yes, like the plaintiff in Saxon, plaintiff loaded trucks, but the difference is here there's insufficient evidence to show that the trucks were frequently bound for out of state with the goods. Can I, I want to walk through this a little bit because I read, I mean, we're relying on Saxon, which obviously is the Supreme Court case, but we've also got our prior case in Rittman. I've spent a fair bit of time trying to understand Rittman, and it's not entirely clear. I'm interested in your reading of it. One reading of Rittman is we look at the whole stream of commerce, meaning where the products come from, then they come to the warehouse, and then when they leave. How, do you read Rittman that way, or do you read it more narrowly? Not, not exactly, Your Honor. I think Rittman and Ortiz both stand for the proposition that when the goods are already in the flow of interstate commerce and the person is handling them, then the courts have found in those two scenarios, last mile delivery drivers, interstate, and in the case of Ortiz, a warehouse worker, that they're engaged in interstate commerce, but the difference here is the goods were manufactured in California. Okay, let's stop right there. You say they were manufactured in California. As I understand it, the record says about 15 percent of the goods were manufactured in California. That Medline produced 15 percent. Do I have that wrong? Yeah, I don't know where that is in the record, Your Honor. I'm referring specifically to Planoff's declaration in the record, at record page 34, and, excuse me, page 33, in paragraph three of her declaration, quote, I packaged medical devices and other items defended manufactured at its Tracy, California warehouse and loaded them. Okay, so that's interesting. So that is her specifically, and that's a good point, but is this analysis limited to her specific duties or the class of workers of which she's a part of, their specific duties? It's both, Your Honor. It's the class of workers, and that's where it gets even, I think, better for us and not as good for the appellant because a couple of things on the evidence on the warehouse operator duties. First, she summarized the warehouse operator duties that purportedly came from a job description that she didn't attach to her declaration, and then Mr. Spivak attached warehouse duties from a job posting a year later for a different location, Rialto, California, but be that as it may, even if we just accept them as face value, nowhere on there do they say anything about transporting out of state or interstate commerce, and I think that's one of the errors the district court made. If you look at the district court's decision on page eight of the record, on page eight, the court specifically says in his declaration, plaintiff attorney David Spivak has attached a job description posted on defendant's website for warehouse operator at their Medline Warehouse in Rialto, California, and then this is the part where I think he goes wrong, which indicates that interstate movement of goods was part of operator's general duties, so there's nothing in there at all that talks about crossing of state lines or anything. Let me focus you in on paragraph four of her declaration where Nair says, oh, a different team, I guess I hadn't picked up on that, a different team of defendant's workers prepared the pallets for me, oh yeah, to arrange in the truck trailers for shipping to destinations in and outside of California. Why isn't that enough to bring it into interstate commerce? Because she says that she was loading trucks, as I read this, she was loading trucks that shipped to destinations both in and outside of California. For two reasons, your honor. One, it lacks foundation, but putting that doesn't say with what frequency shipments are going out of state, and so this falls in line, more in line with the gig economy cases, whether it be a Mediato from the Perth Circuit or Wallace from the 7th Circuit, and some district court decisions that basically say, yeah, why some Grubhub and Uber and Postmate drivers may cross state lines, that's incidental to the class of workers. Could I ask, Mr. Grubhub, her declaration also talks about speaking to a truck driver who said that his, one of the shipments that she prepared was for a truck driver who drove to Reno, and that he said that he does this same drive on a daily basis, and so I guess my question is, one of the things that the district court found was that her declaration establishes that she loads and works on pallets that head out to interstate travel on a daily basis. Aren't we supposed to look at that under a clear error standard? Yes, your honor, the standard is correct, but the premise of what your honor said, I don't believe, respectfully, is incorrect. The paragraph three of her declaration doesn't quite say that she loaded the pallets onto the truck of that particular Nevada driver. She actually says that the driver on one occasion told her, and she says that she loads trucks. She never said she loaded his trucks. She never says with what frequency, how many trucks a day how much of the load is going to Nevada. Just hypothetically, let's say she loaded a truck and every single delivery was in California, except for one last stop in Reno. I'm making up numbers here, but let's say there were 30 California stops and one in Reno. Are we to say now that in every case where something just crossed the state lines even once, that they're frequently engaged in interstate travel? Let me ask you this, because we recently had the Lopez decision come out a few days ago, and that was about a person who fueled airplanes that traveled both interstate and domestically. The court wasn't engaging in some kind of analysis of, well, how many airplanes were flying to local destinations versus interstate destinations. It was enough that this worker was working with the channels of commerce to satisfy the requirements for the exemption. So I guess my question is, what case would you rely on for the proposition that a plaintiff has to specify which trucks are going where on a frequency basis in order to satisfy the exemption? Or to over-conclude? It's not necessarily that the plaintiff has to show that for themselves, but the plaintiff has to show that a class of workers is engaged in interstate commerce. So the cases I would rely on for that general proposition Your Honor just stated are the gig economy cases like Imediato from the First Circuit, Wallace from the Seventh Circuit, and even Lopez versus Sintas in the Fifth Circuit, where they basically say if it's predominantly interstate, it's not enough if there's something that some small portion of the class of workers is dealing with goods that cross state lines. Here's the problem with the Lopez case, though. I would agree with you, and if this was in the Fifth Circuit, you might well have an easy case. But Lopez specifically mentioned that Rittman went the other way. And that's what I'm struggling with, is we seem to have a circuit split. At least, I mean, whether the circuit split is on the specific issue that affects us, I don't know in this case. But I'm not sure how much you can rely on Lopez when the Ninth Circuit seems to have rejected that already. Fair enough, Your Honor. And I do agree there's a circuit split. And as Your Honors probably know, there's a petition requesting review of Ortiz before the U.S. Supreme Court, which has not been ruled upon yet. But either way, the fundamental difference with Rittman and with Ortiz, for that matter, which, you know, I recognize this court is bound by at this juncture, is that the goods were already flowing in interstate commerce in both of those cases. And both decisions relied on that. But the last mile delivery drivers in the Amazon Rittman case, it talked about how the goods were on a continuous stream in interstate commerce. And so even though those drivers only drove interstate, they still qualified for the exemption. And in Ortiz, it was undisputed that the products were coming from overseas and elsewhere, and they were handling them to be turned around and flipped. Here we have these products originating in California at the location, and we have super flimsy evidence that the products were actually going interstate. And actually, I think the inference is reasonable. Can I interrupt you for a second? Of course. What is the burden of, not the burden, what is the standard of proof that you think the district court needed to apply? It seems like most of our cases talk about the legal standard that you've got to have workers directly involved in the transportation of goods. I'm not quite sure what authority there is in terms of what's the evidentiary standard. Is it a preponderance? It is. It is, Your Honor. It's preponderance of the evidence standard that plaintiff had to establish that she was engaged in interstate commerce. And then you get into the, well, that she and her class of workers that she belongs to were engaged in interstate commerce. And then you get into the standard of what it means to be engaged in interstate commerce. And Saxton instructs that the class has to be frequently engaged. It talks about direct and necessary role. So, I mean, I don't think you would dispute, right, that the workers here are involved in the movement of goods. Your only dispute is where the goods going. Correct. That's one of my disputes, but I agree with your first point, Your Honor. My other dispute is that plaintiff didn't put in any evidence that the warehouse operators had a whole, you know, load trucks. But I agree with what Your Honor said so far. So, let me ask this, because there's other evidence that the district court pointed to about the dealer program and advertisements by Medline that it has 43 or more nationwide distribution centers and that it does, in fact, distribute throughout the country. So, is it the case that Medline is only manufacturing in California and sending goods out? No, Your Honor. But in this case, on this record, the products that this plaintiff touched were manufactured in California. And on the second point, I think all that stuff about the dealer drop program and et cetera was a lot more relevant before Bissonnette, when we were arguing over whether Medline is a transportation company. If the court is to draw any reasonable inference from having 43 distribution centers, it's that they don't need any crossings paid lines most of the time because they have enough distribution centers to be, you know, facilitating their local sales. But does Medline ever bring goods into California from interstate in order to sell to California customers or to distribute to California customers? It's not on the record, so I don't know for sure. I mean, I think the inference is that they bring materials in to be manufactured there at least. And with that, I'm happy to answer any other questions. We'll give you time. I think Judge Forrest had a question, and then I've got a couple of questions as well. And we'll give you time. Don't worry. So, I wanted to go back to the part of the declaration that you read, which I think you read to say that the goods that this worker is involved with were manufactured in the Tracy, California location. Is that how you read? What you read to us? Yes. Because I read that as her saying that she was loading things in the Tracy, California location, not that the things she was loading were manufactured there. Respectfully, Your Honor, it says defended, manufactured at its Tracy, California warehouse. It does say that. Read the whole sentence. Read the whole sentence. I package medical devices and other items defended, manufactured at its Tracy, California warehouse, and loaded them onto trucks that were traveling to various destinations. So, I read that as I load these things that the defendant manufactured, and I'm loading them in Tracy, California, because it says otherwise. I mean, there's nothing in the record to establish that warehouse, especially that, is a manufacturing location. Yeah, that's a good point. Because I wanted to point you to, along that same line, ER-139 the record says that Medline manufactures only 15 percent of its products. As I understand it, it's got a product line of about 5,000 products. About 15 percent of those are manufactured by Medline, presumably in California. But that means that there's a whole bunch of these that are manufactured by third parties. Yeah, I mean, I think that's fair. The numbers are off in the sense that I think it's 80,000 that they manufacture against 500,000, but your percentages are there, Your Honor. But it does say other items defendant manufactured. Is the shipment split up that way? Where you're like, hey, our manufactured items are sent out through this warehouse, not the other 85 percent that are not manufactured are sent out by another warehouse? I just don't know, Your Honor. And I have the same record you do, unfortunately, or fortunately, as the case may be. And so that's what I've been working with here. Unless the court has other questions for me at this moment, I'd like to reserve the rest of my time. Is there any evidence of what, at least the items that are manufactured by Medline, are they all manufactured in California? Do we even know the answer to that? I don't know for certain, but I don't believe that to be the case. Okay. Okay. Okay. Yeah, we'll give you time, unless there's more questions. Thank you. Mr. Spivak. You're on mute. Good morning, and may it please the court. I'm David Spivak, and I will be arguing for Dejanair. She is the appellee and the plaintiff in the court below. I'd start by saying that the district court got this one right, and I'd like to go directly to address some of the points that the court has raised with Mr. Grood, which I think are the elephant in the room in this case. Is there, after Bissonette and the decisions that preceded, some kind of quantification standard that's been set up either by the Supreme Court of the United States or the Ninth Circuit, where a plaintiff who is attempting to show that she is an interstate commerce worker, an interstate transportation worker, must show that a specific percentage of the products that she is responsible for moving or touching made it out of state versus those that did not? I don't think there has been such a test, and I don't think it's a problem here. In fact, I think it's such a test. Can I ask, you may be right about that, and we'll have to grapple with that, but I wanted to ask some specific questions, first of all, about this dealer. Here's the problem. I don't think we have a good sense from the record of actually how this stuff works. You heard some of the questioning. Where are the products manufactured? I hadn't medical devices and other items defendant-manufactured. Now, whether it's manufactured at its Tracy, California warehouse or whether it's just the defendant-manufactured, that seems to narrow this down to the products. She may have been inaccurate in her affidavit, but this seems to narrow down the products that we're looking at here, because from what I read from ER 139, Medline only manufactures 15% of its products. We don't even know, unless you can point us, are those 15% of products that Medline manufactures, are those all manufactured in California or are some of those shipped interstate? Well, it's not in the record, Your Honor, and what we do have in the record, however, it's sufficient for the court and the court below to have satisfied everyone else that there was enough going into interstate transportation. In this particular case, whether it might have- Can I ask about that? I want to push back a little bit, because what the district court said, it relied on the dealer prop ship program, but the evidence that the district court relied on was marketing materials from the website that weren't even posted until a year after she worked there. Is there any evidence in the record that this dealer prop ship program was in place while Mayer was working there? Is there any evidence that, as how it operates, was she loading trucks consistent with the dealer prop ship program or was she loading trucks differently? There isn't evidence in support of the court's first point about whether this program was in place or not, where my client worked, but I think it's irrelevant in view of the entire record below. But you would agree that if- Hold on, wait, back up. You would agree with me then that the district court probably should not have relied on the dealer prop ship program, because that is not probative as to what Mayer's responsibilities were. I think if you look at the entire record, it is probative, Your Honor. That was simply one example of the significant level of interstate shipping. Let's go through the other example. The other example is the Reno truck driver. Now, there's a couple of ways to look at this. Number one, I think what we just heard was there's no evidence that Mayer actually loaded a truck that was headed to Reno. If you read this, she talked to a truck driver who said that he came in every day to and from Reno. There's no evidence that she loaded that truck. Now, here's my first question. Does that matter, or can we assume that whether or not Mayer personally loaded that truck, the class of workers of which she was a part of loaded that truck? Your Honor, I think you can only assume that she loaded the truck based on the way her declaration is written. She says that one of the things she did in loading these trucks, which she said she did every day and all day, along with many other workers she observed, was to look at destination lists, and that's referenced in her declaration. These destination lists, one of which said Reno, Nevada. Then you get to the driver, and she happens to speak to one of these drivers of the trucks that she's loading and other workers like her are loading at the Tracy Distribution Center, and he says, I'm taking things to Reno every day. I think the only fair assumption or inference that can be drawn from this is that she is putting these things on the trucks in pallets along with the aid of other workers that are then being taken by drivers working for Medline to go to many places, including out of the state of California. And you draw this from the fact that she, because she's at the shipping dock, she knows the destinations of where these things are going, and so that's how you're connecting it to the conversation with that driver? Correct, Your Honor. She does know to a certain extent because she's looking at the destination sheets. How well she's paying attention to it and quantifying it to determine how much of this is within the state versus over the borders is a question we were unable to answer with our witness in the court below. Why weren't you able to answer that? That's where I'm struggling here because I'm hesitant. Look, I'm hesitant to just allow all these inferences to come in. I mean, maybe that's the way it should go. Maybe under Rittman, we've sort of, maybe we've eliminated the need even to draw these inferences. But it seems to me she knew where the destination, she was seeing the destination list. Did you ask for discovery of the destination lists? That's exactly what we did, Your Honor. In our opposition, and you can see this in our memorandum of points and authorities, we said, look, there is a dispute between the parties here. Let us conduct discovery on this subject so we can figure out whether our client is truly an interstate transportation worker or not. And of course, implicit in that is how much contact she's having with products of Medline that are going over the borders. The defendant didn't take us up on it, nor did the court below. And I think what the court below said was you don't need to do that because Mr. Epperson's declaration, the head of human resources, makes it abundantly clear that these guys are putting things on trucks all day and shipping things. This is what warehouse operators do, whether they're in Rialto or not. He doesn't distinguish. He says, this is what they're all doing. And I believe that, combined with my client's declaration about what she observed on the lists and who she spoke to, who were drivers, and the training program she talked about in her declaration, where she says she was expected by Medline to ship things not only in California, but nationwide. The very arbitration agreement that we are talking about in this case, the premise of it is that this is a company that sends things both domestically and internationally. Mr. Epperson makes that clear. The defendant makes that clear in their MPA. The defendant here, or the appellant here, is simply trying to hold plaintiff's feet to the fire for a record that is in some ways paltry due to the defendant's own making. The defendant in the Epperson declaration had every opportunity. Counsel, it sounds like the district court, though, also didn't allow discovery. And one way to handle this, I'm not sure that it's where we need to go, but one way to handle this would be to send it back down and say, no, we do need discovery because the record is not clear. It may well be that your client is ultimately able to bear her burden by leaps and bounds. I have some concern about whether this satisfies that based on what we're reading now. It would have been better to have a little bit more discovery. I'm not faulting you for that, but I wonder if we need to send a message that it's not enough just to kind of do a gut check. We need to actually look at this stuff and figure it out. Let me ask you this. Let's say, because what we also don't know, let's get back to where you started, that there's no comparative, the frequency isn't important. So if your position would be if 100 shipments went out every day, 99 of them went within California from Tracy Warehouse, and then this one, she happens to talk to the one truck driver who goes to Reno every day, your position would be that would be enough no matter what, right? Combined with the training she received, which is recounted in her declaration, it is more than enough, including the destination sheet and including the fact that this is a company that says in its arbitration agreement, which we know predates the other materials in question, that they are shipping domestically and internationally. There is no doubt things are going elsewhere, and it doesn't matter if my client is at the beginning of the journey, the middle of the journey, or the end. There can be nothing more intimately connected with interstate commerce, as we know from the Birch decision, which even predates the FAA, than somebody who is loading cargo. And she, unlike a gig worker, is doing that every single day, going into trucks that are traveling this 200-mile journey from Tracy to Reno, Nevada, among other places. If we get into a quantification battle in the courts below, this will run into the very problem that Bissonette was concerned with. Bissonette was concerned with something comparable. How do we determine whether a is a delivery company or a pizza company? How do we determine those things? Do we want these simple motions to arbitration to be converted into these discovery-intensive, slow mini-trials in which we go through manifest after manifest after manifest to calculate how much one worker versus another was responsible for packages going over the borders or staying within the borders? This won't be a simple arbitration motion anymore. Let me ask this, Mr. Spivak. I'm not sure that we're even in a quantification battle, because I haven't seen anything on the record from Medline to suggest that it is only shipping within the state of California. And so I go back to our recent case in Lopez, where the district court there said that the evidence that the similar, that there was no evidence to contradict what the plaintiff was saying about the movement interstate. So do we even need to get into a quantification issue if there isn't any evidence to juxtapose or to suggest from Medline that it was actually only shipping within the state from its Tracy warehouse, for example? We don't, Your Honor, because my client has said enough in her declaration and Mr. Epperson has said enough in his declaration, which does not contradict in any remote sense what my client says about the work she did every day and the work she observed the other warehouse operators, the members of the class that she was observing every day. So I think we have more than enough here. And I just think to try to, I mean, I just want to push back on that a little bit, because on the one hand, you didn't even need discovery, right? She read these manifests. She could have put in her declaration, hey, I know these were going to Nevada and Idaho and Arizona. She didn't do any of that. I mean, it's interesting that she didn't make this a little easier on the record. I believe she did enough of that, Your Honor, by saying they went everywhere. They didn't just go within the state of California. They went out of the state. The one she could remember was Reno, Nevada. But again, consider the vantage point of my client. Mr. Epperson, the Director of Human Resources, was in a much better position to marshal the evidence on this score and chose not to do so in response to my client's declaration. My client was, as a simple warehouse worker that she was, able to say long after her employment ended, I remember this much. I remember I was trained and it was an expectation that I would be shipping within the state, without the state, that I move things on the trucks every day. I saw a destination list that talked about things going throughout the country. And one place I remember specifically was Reno, Nevada. And perhaps the reason she remembers that so well was this discussion she recounts about the truck driver reporting to her that he was leaving that warehouse every day destined for Reno, Nevada. Can I ask you, if we just had paragraph four of her affidavit, let's say this was all that was in the record. And she said, I arranged on truck trailers for shipping to destinations in and outside of California. Would that be enough on its own? Let's say we rejected all the other evidence. Would that be enough to find interstate commerce here based on that statement alone? It would, because she says every day. And your position is, if Medline doesn't agree with that, she's met her burden, then Medline can come back and say, well, this is what she said, but let's look at how this actually works. And that's not accurate. Absolutely. They could have taken me up on my offer of discovery. They could have taken depositions. They could have done what Uber did in Capriol. And we can't of the number of drives that went to airports, 10.1%. They marshaled the number of drives that left the state of California, 2.5%. We're not in that territory. My client wasn't doing something incidental and casual by moving things onto trucks. This was daily for her, what she and the class of workers she intends to represent we're doing every day of the week. And we know if it's happening every day, it's a lot more than 2.5%. The kind of hair splitting the defendant would ask us to get into without having beefed up the record as it could have in the court below would simply create a problem for every other arbitration motion that ends up before this court on appeal, which is exactly what's going to happen. If we have these enormous discovery battles in the courts below about, so I I'm sensitive to what you're saying, but I'm also sensitive to the idea that we don't want to read the interstate requirement as just a minor hurdle that is a nuisance. I mean, it has some meaning. And so, I mean, there should be a requirement, a threshold requirement to meet it. Maybe you have here, but you understand the balance that we're trying to weigh here. We don't want these to turn into battle royales, but we also want to make sure that there's evidence in the record that it actually is interstate commerce. And you're honored to answer your question. If Mr. Epperson, hypothetically speaking, had said in his declaration, we never shipped from that Tracy warehouse to anywhere outside the bounds of the state of California. And my clients had said nothing about where the products were going. We wouldn't be here. I would have lost in the court below. But those aren't our facts. Our facts are substantially more on the subject of interstate transportation. And my client, if we look at the Ortiz case, which I think is the closest to ours, Ortiz was moving things just a few feet, admittedly a very small distance within a warehouse. We don't even know if he moved things anywhere near the trucks just within the warehouse. And the Ninth Circuit determined that that was sufficient. I can't see by any stretch of the imagination how, with the amount my client has said on the subject of interstate transportation in this case, that she would be denied the benefits of the exemption as Mr. Ortiz was in that case. Thank you, Counselor. Unless any of my colleagues have other questions. Mr. Grood, we'll give you two minutes for rebuttal. Thank you, Your Honors. Your Honors. First, the question is not whether the company is in interstate commerce. The question Saxon asked the court and us to look at is what the class of workers is. And the class of workers have to be frequently engaged in interstate commerce. And as Judge Nelson pointed out, the plaintiff was in a position to declare this. If you look at paragraph 5 on page 34 of the record, the paragraph is incredibly detailed about how she organized the packages, put the labels on them, organized them by the destinations. And then in the end, it's a big load up. And all it says is, after I loaded the pallets onto the truck trailers, the truck drivers would transport them to various destinations. It doesn't even say various destinations in and outside of California there. It just says various destinations. I submit the declaration was carefully crafted because the reality was the only evidence of Nevada that the plaintiff had was this purported conversation with a driver. Additionally, Your Honors, there does have to be some quantification. It can't just be none. What about, Mr. Grood, what about the suggestion that she's met some sort of prima facie requirement? She does say we shifted to destinations in and outside of California. She does say that at least one truck was going daily between Reno and Tracy. Why doesn't that shift the burden to you? And you could have put in an affidavit just saying we don't do this. We don't. I mean, you sort of seem to be hiding behind the ball. My fear is if we took you up and remanded this to the district court, my suspicion is there'd be plenty of evidence that these shipments are going outside of California. There's two questions I'd like to answer, Your Honor, that you just posed that I'm not sure in 19 seconds we'll get it done. The first is on the declaration. I just want to point out we had one week for a reply in a 16-page opposition that asserted about 20 challenges to arbitrability. Only one page is on the transportation worker exemption. So it wasn't really a real practical place to focus the efforts on the evidence at that point, particularly before the Ortiz case hadn't even come out. It was unheard of to have a warehouse, you know, associate person, you know, be a transportation worker exemption. Mr. Spivak was essentially trying to create new law at that point based on Saxon. And on Your Honor's other question, which now I lost, I'm sorry. Well, my other question was, let's say we did remand this back down. My suspicion, and I want to give you an opportunity to correct me, is that there would be plenty of evidence that these shipments were going interstate and intrastate. I actually don't know the answer to that, Your Honor. But I will just say, if you look at the record on page 136, where plaintiff asked the court to allow for discovery, it's not as broad as Mr. Spivak makes it sound. In there, he actually says, he makes some quotes from Mr. Epperson's declaration, but the quotes he makes, none of that plaintiff disputes at that point, that the warehouse operators are nearly always working in a Medline facility, meaning they're not driving off somewhere, and that they're putting away incoming inventory, picking product, packing it, repacking or staging it. And so all he asked for is that before the court decide that he should have an opportunity to depose Mr. Epperson or others before the court credits Mr. Epperson's declaration. They haven't argued that Mr. Epperson's declaration is not credible. They're just claiming that it wasn't enough. So it's not, they really haven't asked for the type of discovery that Your Honors have been talking about today. Mr. Grew, can I ask, you know, if this declaration were just paragraph four, you know, there may be issues with it, but paragraph 12 about the training video kind of makes it hard to judge Nelson's point, to think that somehow there is not interstate commerce happening. I mean, you have a training video that explains defendantship, the expectation that the class of workers that plaintiff is involved in is going to ship medical supplies throughout the country. And they show a map of the United States with all of the defendants' facilities throughout the United States. And this is being shown to people, to warehouse operators at its Tracy facility. So why isn't it reasonable to infer that that's actually what happens, that consistent with the plaintiff's declaration, it is actually going to destinations outside of California? Because I think the presumption is the training video is being used across the country for everybody. And obviously, you would expect to have probably differences in places like the tri-state area of New York or something, you might somewhere else. And ultimately, the legal standard is what the plaintiff, you know, what the class of workers here did and what the plaintiff did. And so we look at her evidence, the evidence about her allegedly put the loading products onto a truck that goes to Nevada every day, completely lacks foundation as written. And again, if we're under the, if we made assumptions that it went to Nevada once out of 100 or once out of 30, I don't think it would be enough under the line of cases I've already discussed at the beginning, where goods are manufactured in California, say ingredients come from outside of California, they're manufactured in California, and then they're delivered in California, but some people in the group sometimes cross state lines. That's even, I think, a stronger case for interstate commerce that we have here because she's not the one driving, yet the courts have found that the class of workers are not engaged in interstate commerce. I see my time is more than up, I'm happy to answer any questions that are not, I'll submit, Your Honors. Okay, thank you. Thank you to both counsel for your arguments in this interesting case. The case is now submitted and that resolves our arguments for the day. Thank you, Your Honors.
judges: NELSON, FORREST, SANCHEZ